**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| JENNIFER O'NEAL, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 1:23-CV-140 SRW |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant(s). | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on review of an adverse ruling by the Social Security

Administration. The Court has jurisdiction over the subject matter of this action under 42 U.S.C.

§ 405(g). The parties consented to the exercise of authority by the United States Magistrate

Judge pursuant to 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. ECF

No. 22. Defendant filed a Brief in Support of the Answer. ECF No. 23. The Court has reviewed

the parties' briefs and the entire administrative record, including the transcripts and medical

evidence. Based on the following, the Court will affirm the Commissioner's decision.

I.      **Factual and Procedural Background**

On November 17, 2016, Plaintiff Jennifer O'Neal protectively filed an application for

disability insurance benefits under Title II, 42 U.S.C. §§ 401, *et seq*. with an alleged onset date

of December 11, 2014. Tr. 157-63, 199. Plaintiff's application was denied on initial

---

[1] At the time this case was filed, Kilolo Kijakazi was the Commissioner of Social Security. Martin J. O'Malley became the Commissioner of Social Security on December 20, 2023. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name, and the Court may order substitution at any time. *Id.* The Court will order the Clerk of Court to substitute Martin J. O'Malley for Kilolo Kijakazi in this matter.

consideration and reconsideration. Tr. 83-88, 122-26. On March 17, 2017, she requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 89-90.

Plaintiff appeared for a telephonic hearing, with the assistance of counsel, on October 16, 2018. Tr. 33-67. Plaintiff testified concerning her disability, daily activities, functional limitations, and past work. *Id*. The ALJ also received testimony from vocational expert ("VE") Darrell Taylor. On the same date as the hearing, Plaintiff amended her alleged onset date of disability to March 17, 2017. Tr. 198. On February 26, 2019, the ALJ issued an unfavorable decision finding Plaintiff not disabled. Tr. 7-25, 810-28. On April 29, 2019, Plaintiff filed a request for review of the ALJ's decision with the Appeals Council. Tr. 155-56. On October 8, 2019, the Appeals Council denied Plaintiff's request for review. Tr. 1-6, 829-34.

Plaintiff appealed the Commissioner's decision to this Court on December 11, 2019. Tr. 835-44. *See O'Neal v. Kijakazi*, Case No. 1:19-CV-225-NAB (E.D. Mo.). On October 5, 2021, the Honorable Magistrate Judge Nannette A. Baker remanded the action to the Commissioner, finding the decision was not supported by substantial evidence on the record as a whole. Tr. 845-63; *O'Neal v. Kijakazi*, 2021 WL 4552167 (E.D. Mo. Oct. 5, 2021). Specifically, this Court found that because the ALJ assigned little weight to the medical opinions, there was insufficient evidence in the record to substantiate the RFC limitations and reversal was required so "the ALJ [could] obtain a consultative examination and make a new RFC and credibility determination." Tr. 861.

On June 30, 2022, the Appeals Council vacated the final decision of the Commissioner and remanded the case back to the ALJ "for further proceedings consistent with the order of the court." Tr. 866. Another hearing was held on March 24, 2023, in which Plaintiff and VE Delores

E. Gonzales testified. Tr. 771-93, 890. On April 28, 2023, the ALJ issued a second unfavorable decision. Tr. 745-70.

With regard to Plaintiff's testimony, medical records, and work history, the Court accepts the facts as presented in the parties' respective statements of facts and responses. The Court will discuss specific facts relevant to the parties' arguments as needed in the discussion below.

## II.    Legal Standard

A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" § 1382c(a)(3)(B).

The Commissioner follows a five-step sequential process when evaluating whether the claimant has a disability. 20 C.F.R. § 416.920(a)(1). First, the Commissioner considers the claimant's work activity. If the claimant is engaged in substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see whether the claimant has a severe impairment "which significantly limits claimant's physical or mental ability to do basic work activities." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010); *see also* 20 C.F.R. § 416.920(a)(4)(ii). "An impairment is not severe if it amounts

only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 20 C.F.R. §§ 416.920(c), 416.920a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(5)(i). An RFC is "defined as the most a claimant can still do despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011); *see also* 20 C.F.R. § 416.945(a)(1). While an RFC must be based "on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016). Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Ultimately, the claimant is responsible for *providing* evidence relating to his RFC, and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). If, upon the findings of the

4

ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work which exists in significant numbers in the national economy shifts to the Commissioner. *See Brock v. Astrue*, 574 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work which exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled. 20 C.F.R. § 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. *Id.* At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant. *Hensley*, 829 F.3d at 932.

If substantial evidence on the record as a whole supports the Commissioner's decision, the Court must affirm the decision. 42 U.S.C. §§ 405(g); 1383(c)(3). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. Under this test, the court "consider[s] all evidence in the record, whether it supports or detracts from the ALJ's decision." *Reece v. Colvin*, 834 F.3d 904, 908 (8th Cir. 2016). The court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Id*. The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016).

## III.    The ALJ's Decision

Applying the foregoing five-step analysis, the ALJ found Plaintiff last met the insured status requirements of the Social Security Act on September 30, 2019. Tr. 751. Plaintiff did not engage in substantial gainful activity during the period from her amended alleged onset date of March 17, 2017, through her date last insured of September 30, 2019. *Id*. Plaintiff has the severe impairments of "a migraine headache disorder, complex regional pain syndrome versus fibromyalgia, gout, and obesity." Tr. 751-52. Through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. Tr. 753. The ALJ found Plaintiff had the following RFC through the date last insured:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps or stairs, and occasionally balance, stoop, kneel, crouch, and crawl. She could have no exposure to dangerous unprotected heights or dangerous unprotected moving machinery, and no exposure to whole body vibration. She could have no concentrated exposure to extreme heat, extreme cold, humidity, or pulmonary irritants. She was limited to a maximum environmental noise level of DOT/SCO code 3 – i.e., moderate.

Tr. 753.

The ALJ determined, through the date last insured, Plaintiff was able to perform her past relevant work as an administrative clerk (*Dictionary of Occupational Titles* ("*DOT*") No. 219.362-010, light exertion and semi-skilled). Tr. 761. This work did not require the performance or work-related activities precluded by Plaintiff's RFC. Tr. 761-62. Alternatively, the ALJ also concluded Plaintiff could perform other jobs, including price marker (*DOT* No. 209.587-034, light exertion and unskilled), office helper (*DOT* No. 239.567-010, light exertion and unskilled), and mail clerk (*DOT* No. 209.687-026, light exertion and unskilled).

6

The ALJ concluded Plaintiff was not under a disability, as defined in the Social Security Act, from March 17, 2017, the amended alleged onset date, through September 30, 2019, the date last insured. Tr. 763.

## IV.    Discussion

Plaintiff presents three assignments of error: (1) the RFC is not supported by substantial evidence; (2) the ALJ's decision lacks a proper evaluation of Plaintiff's headaches and pain; and (3) the ALJ failed to comply with this Court's October 5, 2021 Memorandum and Order issued by the Honorable Judge Nannette A. Baker. ECF No. 22.

### A. Evaluation of Plaintiff's RFC

In order to determine whether the ALJ properly formulated the RFC, the Court will first review and summarize the evidence of record as to Plaintiff's severe physical impairments. The Court will not address Plaintiff's mental or psychological impairments as she does not dispute the ALJ's evaluation of her depression, affective disorder, or anxiety disorder.

Plaintiff described her symptoms in her Function Report, dated March 31, 2017, and at the administrative hearing held on March 24, 2023. Tr. 239-53, 754-55, 771-93. Within the Function Report, Plaintiff indicated her chronic migraines caused her to spend 85% of her time "in bed, in a doctor's office, or ER" due to nausea, vomiting, and fever. Tr. 754 (citing Tr. 239). She reported fluorescent lighting and computer use was an "instant trigger for onset of a migraine" and "moving from one position to another" could make her "violently sick." *Id.* Plaintiff stated her migraines caused her to lose sleep and affected her ability to maintain personal hygiene. *Id.* (citing Tr. 240). She indicated she could not cook or perform household chores, did not drive, and would only leave her home for medical care. *Id.* 754 (citing Tr. 241-42). She reported she had issues walking, lifting, squatting, bending, standing, reaching, and

7

climbing stairs. *Id.* (citing Tr. 244). Plaintiff indicated her medications caused side effects, including dizziness, chest tightening, drowsiness, dry mouth, fatigue, weight gain, nose bleeds, and weakness. *Id.* (citing Tr. 245).

At the hearing, Plaintiff testified to having insurance coverage until her divorce in 2019. Tr. 754 (citing Tr. 777-78). She appeared to indicate her parents and children pay her bills. *Id.* (citing Tr. 777-78). She explained the reason she stopped working was due to severe migraine headaches. *Id.* (citing Tr. 780-81). Although she received a stimulator implant to help relieve her symptoms, she testified she continued to experience 15 to 20 migraines per month. *Id.* (citing Tr. 783). She claimed her headaches prevented her from getting out of bed or visiting places with fluorescent lights or strong smells, such as the grocery store, because the lights and smells could trigger a headache. *Id.* (citing Tr. 786). Plaintiff testified to receiving two rounds of Botox for migraine treatment. Tr. 56-57. She claimed she contracted botulism from the second round of injections and almost died. *Id.* As noted by the ALJ, the medical record does not contain any notes related to botulism. Tr. 759. Rather, treatment notes after her second injection indicate she had no side effects from her oral medication and the "neck pain with her first Botox injection" resolved itself. Tr. 290.

After summarizing Plaintiff's description of her impairments, the ALJ reviewed the medical record. On March 2, 2017, a few weeks prior to her alleged amended onset date, Plaintiff appeared to her primary care physician ("PCP"), Paul Moniz, D.O., complaining of a "throbbing and pounding headache" "exacerbated by exposure to bright light." Tr. 766 (citing Tr. 437). The ALJ found it relevant that upon a physical examination, Dr. Moniz described her to be in "no apparent distress" and found no neurological abnormalities. *Id.* (citing Tr. 439). The Court

notes, on this visit, Plaintiff received Ketorolac Tromethamine[2] and Promethazine[3] injections and was directed to rest and increase oral fluid intake. The following week, Plaintiff returned for a follow-up visit. Tr. 755 (citing Tr. 433-36). Dr. Moniz described her to be "moderately ill" and in "mild pain." *Id.* (citing Tr. 435). Upon examination, she walked with a normal gait. *Id.* (citing Tr. 435).

On May 8, 2017, Plaintiff appeared to Vertex Spine and Pain to program her permanent stimulator implant. Tr. 755 (citing Tr. 401-03). Plaintiff described her "normal" pain to be at the "top of [her] head and sides." Tr. 401. She reported that after getting the stimulator implant in 2016 she was able to perform "overall daily activities, light chores, [and] family activities" with "90% relief," but complained of recent increased "left sided head pain." *Id.* She denied medication side effects. Tr. 402. Upon physical examination, she was described to have a normal gait and balance, a negative response to Romberg testing, no motor or sensation deficits, and normal cognition. Tr. 402. The ALJ found it significant these medical records indicated she could perform some level of daily activities and had no medication side effects; however, she claimed in her Function Report, dated approximately one month prior, that she had difficulties walking, could not perform basic household chores, and had an array of side effects from her medication. Tr. 758. *Compare* Tr. 401-03 *to* Tr. 239-53.

On June 12, 2017, Plaintiff returned to Dr. Moniz for a follow up related to depression and allergies. Tr. 615-19. He described her as "moderately ill" and "tired-appearing" with painful range of motion in the back, but indicated she had a normal gait and no other abnormalities. Tr.

---

[2] "Ketorolac, a nonsteroidal anti-inflammatory drug, is an option for the management of acute moderate-to-severe pain." U.S. National Library of Medicine, National Institutes of Health, https://www.ncbi.nlm.nih.gov/books/NBK545172/ (last visited July 9, 2024).

[3] "Promethazine is a medication used to manage and treat allergic conditions, nausea and vomiting, motion sickness, and sedation." U.S. National Library of Medicine, National Institutes of Health, https://www.ncbi.nlm.nih.gov/books/NBK544361/ (last visited July 9, 2024).

755 (citing Tr. 617). During her next two visits with Dr. Moniz, July 12, 2017 and August 3, 2017, Plaintiff was described to be in no apparent distress and minimally ill with no gait or ambulation concerns. Tr. 756 (citing Tr. 622, 627). Although both records generally indicated headaches as a symptom of allergies, neither visit focused on migraine issues. At her August 3, 2017 visit, Plaintiff indicated she was working full-time. Tr. 625.

On November 9, 2017, Plaintiff appeared to Dr. Moniz for the onset of a migraine. Tr. 630-34. This was the first office visit specifically related to migraines since May of 2017. Plaintiff described the pain as "throbbing, pounding, [and] squeezing" like her "head will explode." Tr. 630. She also endorsed associated symptoms, including chills, nausea, tooth pain and grinding, phonophobia, photophobia, sinus congestion, stiff neck, vision disturbances, and vomiting. *Id.* Despite these complaints, the ALJ found it relevant that she did not appear in distress during her physical examination and exhibited an appropriate affect and demeanor. Tr. 756 (citing Tr. 632). For treatment, Plaintiff was provided with a refill of two oral medications to assist with reducing the symptoms, was directed to keep a headache diary, and to follow up in three months. Tr. 633.

At her three month follow up, on January 22, 2018, she was primarily evaluated for acute sinusitis. Tr. 635-38. Upon physical examination, she was described to have a normal gait despite reported back pain. Tr. 756 (citing Tr. 637). She was provided medication for an upper respiratory infection, but no assessment or recommendation was made related to her migraine headaches. Tr. 637-38. Two weeks later, on February 5, 2018, she returned to Dr. Moniz's office for complaints of a "sharp and stabbing" migraine. Tr. 756 (Tr. 639-42). Again, the ALJ noted she was found to be in no acute distress and had a normal neurologic and psychiatric evaluation. *Id.* (citing 641). She was provided with Ketorolac Tromethamine and Promethazine injections,

10

instructed to use cold packs on her forehead, and encouraged to maintain normal sleep patterns. Tr. 642. She was told to call if there was no improvement in one day. *Id.* There is no indication that she called to report lack of improvement.

On March 21, 2018, Plaintiff returned to Dr. Moniz's office to discuss persistent "muscle pain," which she reported having for the past five years. Tr. 643-46. Treatment notes identify her complaint as "chronic pain syndrome." *Id.* At this appointment, Plaintiff again indicated she was working full-time. Tr. 643. Upon physical examination, she was described to have "generalized myalgias" from the "core to lower extremities," but maintained a normal gait and did not appear to be in distress. Tr. 756 (citing Tr. 644-45).

On June 4, 2018, Plaintiff appeared for a follow up visit regarding her chronic pain, which she described to be "moderate" and "localized to the mid back and lower back." Tr. 647. She also reported a migraine, but was negative for chills, fatigue, fever, and blurred vision. *Id.* Although these treatment notes described her to be in no apparent distress, two weeks later she was described to be in "apparent pain." Tr. 756 (citing Tr. 649, 653). The ALJ noted that Dr. Moniz described Plaintiff to be in "severe pain" in July and August of 2018 despite not showing any overt or apparent distress. Tr. 756 (citing Tr. 657, 662). On September 28, 2018, she exhibited normal gait and appropriate affect and demeanor. Tr. 756 (citing Tr. 965). In December of 2018, she was no longer described to be in severe pain. Tr. 970.

The ALJ found it relevant that after the December 2018 appointment Plaintiff stopped seeing her primary care physician until May 21, 2020, which was approximately eight months after her date last insured. Tr. 756. The ALJ noted that although the record showed she lost her health insurance sometime in 2019 due to a divorce, she did not appear to seek or inquire about

any affordable treatment options, including assistance from an emergency department, "which under Federal law [she] could not have been denied despite lack of coverage." Tr. 757.

At her May 2021 visit with Dr. Moniz, Plaintiff sought refills for her hydrocodone and Xanax prescriptions. *Id.* (citing Tr. 974). Dr. Moniz wrote this was an unusual request because she had not been prescribed these medications for many months and had reported moving to Arkansas since her last visit. *Id.* Consequently, he denied her refill request. Tr. 977. Plaintiff was subsequently ordered to take a drug screen, which tested positive for methamphetamines, ecstasy, and amphetamines. Tr. 757 (citing Tr. 982).

After reviewing the medical record, the ALJ observed that although Plaintiff reported exacerbated migraine symptoms due to bright light and noise exposure, *see, e.g.,* Tr. 630, 639, 660, 952, 962, no treating physician described her to be particularly sensitive to the lights or noise in the medical office environment. The ALJ also found it significant that Plaintiff's "frequency of treatment-seeking for acute migraine headaches before her alleged disability onset date and while she was still working, [was] not significantly different than the frequency of treatment-seeking after her amended alleged disability onset date." Tr. 758. In fact, the ALJ found her medical visits to have decreased after her onset date. *Id.* The ALJ further noted that prior to her onset date she reported up to 22 headaches per month but managed to maintain full-time employment. *Id. See* Tr. 361.

The ALJ found Plaintiff's treatment to be primarily conservative and managed by her PCP rather than a specialist. Tr. 758. By March 8, 2017, she no longer saw a neurologist. Tr. 403, 759-60. The ALJ noted that although Plaintiff wrote in her Function Report that she typically spent 85% of her days in bed, in a doctor's office, or ER, Tr. 239, there were no emergency room treatment notes within the record during the relevant period. The ALJ also

found it noteworthy that she was divorced in 2019, moved to another state, and had a fiancé by June of 2020. Tr. 759. The ALJ reasoned that finding a partner and getting engaged did not align with her account of spending most of her time in bed or seeking medical care. *Id.* Further, the ALJ considered that although she reported a preference to avoid light and noise, she indicated she sometimes watched movies with her children. Tr. 243, 759.

The ALJ then evaluated the opinion evidence of record. On September 28, 2018, Dr. Moniz completed a Physical Residual Functional Capacity Questionnaire regarding her diagnoses of "chronic migraines" and "chronic pain (fibromyalgia working diagnosis)." Tr. 715-18. Dr. Moniz opined that due to Plaintiff's constant pain she could only sit or stand for 15 minutes without having to get up, sit down, or walk around; could only sit, walk, or stand for less than 2 hours in an 8-hour workday; must shift positions often; would likely need to take unscheduled breaks every 15 to 30 minutes; and must elevate legs at a 60 degree angle for 80% of the work day. Tr. 716-17. Dr. Moniz indicated, however, that she did not need any assistive devices for ambulation. He further opined she could occasionally lift and carry less than 10 pounds; rarely lift and carry 10 to 20 pounds; never lift and carry 50 pounds; frequently look down, turn head right or left, and look up; occasionally hold head in static position; occasionally climb stairs; rarely twist; and never stoop or bend, crouch or squat, climb ladders, or climb stairs. Tr. 717-18. Dr. Moniz indicated she could only engage in handling 50% of the day and fine finger manipulate only 80% of the day. Tr. 718. He predicted she would be absent more than 4 days per month. *Id.*

13

The ALJ found Dr. Moniz's Physical RFC Questionnaire to have "no weight."[4] Dr. Moniz indicated he completed the form with his patient, which suggested to the ALJ that the answers to the Questionnaire were "largely or entirely" reflective of Plaintiff's subjective complaints. Tr. 760 (citing Tr. 718). The ALJ also found the Questionnaire to be inconsistent with Dr. Moniz's treatment notes often describing her as not distressed, contrary to Plaintiff's mostly conservative treatment, and incompatible with the fact that she worked full time during some of the relevant period. *Id.* The ALJ also found it significant that when the Questionnaire was completed on September 28, 2018, he had yet to submit her for a drug screening, the results of which "raise[d] the possibility of symptom magnification to obtain narcotics." *Id.* The ALJ did not further elaborate on the "no weight" determination because this Court already determined it was appropriate to discredit the opinion. *Id.*; *see O'Neal*, 2021 WL 4552167, at *4 ("Upon review of the record, the Court concludes the ALJ properly evaluated Dr. Moniz's medical opinion and provided sufficient explanation for giving his RFC opinions little weight.").

The ALJ acknowledged that the underlying transcript included records from neurology providers, but did not attribute any weight to those opinions because they were created prior to the alleged onset date. Tr. 760-61. Further, the ALJ noted the last documented neurology appointment was in early 2016 when Plaintiff "was informed that [the] neurologist would not prescribe Norco or narcotics after which she did not return for any further appointments." Tr. 761.

As for the formulation of the RFC, on remand the ALJ gave substantial weight to the June 14, 2017 opinion of the state agency's non-examining physician, Denise Trowbridge, M.D.

---

[4] Many Social Security regulations were amended effective March 27, 2017. Per 20 C.F.R. § 404.1527, the Court will use the regulations in effect at the time that this claim was filed, which required an ALJ to determine the "weight" of a medical opinion rather than its persuasiveness.

Tr. 761 (citing 74-79). Dr. Trowbridge opined Plaintiff could perform light work with certain exertional, postural, and environmental limitations, which are reflected on the ALJ's final RFC determination. Tr. 75-76. In finding her opinion to have substantial weight, the ALJ explained:

> On reviewing the entirety of the longitudinal evidence, including the additional medical evidence submitted after the previous decision was rendered in February of 2019, the undersigned finds the opinions of Dr. Trowbridge to be largely consistent with the remainder of the record as a whole, including the fact that the claimant has received largely conservative treatment after her amended alleged onset date, and the fact that she did not obtain much (if any) treatment between December of 2018 and her date last insured of September 30, 2019. The consistency of Dr. Trowbridge's opinion with the rest of the record outweighs the fact that she did not have the opportunity to review any medical evidence dated after June of 2017. In addition, the record does not generally show that the claimant's impairments worsened significantly between that month and September 30, 2019, the date last insured in this case. The undersigned also notes that Dr. Trowbridge was familiar with disability program rules and their evidentiary requirements at the time she rendered her opinion.

Tr. 761.

Plaintiff argues the ALJ erred in evaluating Dr. Trowbridge's opinion because he did not "explain how the doctor's RFC findings [were] consistent with the fact that [P]laintiff was not able to afford medical treatment for specific periods of time." ECF No. 22 at 4. Plaintiff also contends the ALJ's discussion of conservative treatment was "misleading and not supported by the evidence" because the record showed she pursued a variety of solutions, including injections, Botox, narcotics, a spinal stimulator, but the pain was worsening. *Id.* Additionally, Plaintiff takes issue with the fact that Dr. Trowbridge's opinion was supported by only one month of medical records.

A claimant's RFC is "the most a claimant can do despite [the claimant's] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an

15

individual's own description of his [or her] limitations.'" *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quoting *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008)). However, "[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007).

Based on a careful review of the record, the Court finds the ALJ's determination was supported by substantial evidence on the record as a whole, including medical evidence and addressing Plaintiff's ability to function in the workplace. "The ultimate burden of persuasion to prove disability . . . remains with the claimant." *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). Although Plaintiff may generally interpret the underlying medical record to support greater physical limitations, it is not this Court's responsibility to reweigh the evidence. "If substantial evidence supports the decision, then we may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if we may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).

Plaintiff argues the ALJ erred in evaluating Dr. Trowbridge's opinion because he did not "explain how the doctor's RFC findings [were] consistent with the fact that [P]laintiff was not able to afford medical treatment for specific periods of time." ECF No. 22 at 4. The ALJ did consider there was a gap in regular treatment starting in January 2019 because she lost her health

insurance due to a divorce. Tr. 754, 777 (Plaintiff testified to losing health benefits). However, the ALJ also observed she did not appear to seek or inquire about any affordable treatment options, including assistance from an emergency department, "which under Federal law [she] could not have been denied despite lack of coverage." Tr. 757. Notably, none of the medical records reflect that her physicians were concerned about Plaintiff's ability to afford treatment or that she even attempted to discuss payment options or sought information about alternative providers for individuals without insurance, such as a low-income clinic. Although an inability to pay may justify a claimant's failure to seek medical care, a claimant must present evidence that her failure to seek treatment was due to the expense. *See, e.g., Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (ALJ appropriately discounted claimant's argument he could not afford medical care absent evidence he sought and was denied low-cost or free care); *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989) (although lack of funds may sometimes justify failure to seek medical care, there was no evidence plaintiff had told his physicians he could not afford the prescription at issue and was denied the medication). The Court finds no error in the ALJ's discussion of her lack of insurance during the relevant time period.

Plaintiff also contends the ALJ's discussion of conservative treatment was "misleading and not supported by the evidence" because the record showed she pursued a variety of solutions, including injections, Botox, narcotics, and a spinal stimulator. *Id.* The Court finds no error in the ALJ's characterization of Plaintiff's treatment as conservative. Prior to her onset date she obtained a spinal stimulator, *see* Tr. 401, and underwent two Botox treatments, *see* Tr. 290. Plaintiff did not see a neurologist during the relevant time period, and was treated only by her PCP. Tr. 403, 758-60. Although she sometimes received injections for pain alleviation, Plaintiff's PCP primarily treated her with hydrocodone and often described her to be in no

apparent distress during office visits. As mentioned above, from June 2019 to May 2020, Plaintiff did not visit her PCP or refill her prescriptions. *See* Tr. 974. Also noteworthy is that from June 12, 2017 to November 9, 2017, Plaintiff did not visit her PCP for any migraine treatments. *See supra* pp. 9-10. Treatment which is occasionally more invasive or less conservative may still be considered a "conservative course of treatment" when the evidence shows a lack of consistent complaints, objective symptoms, and ongoing treatment of the same severity. *Buford v. Colvin*, 824 F.3d 793, 796-87 (8th Cir. 2016) (citing *Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998)). *See also Trudell v. Saul*, 2021 WL 1238215, at *6 (E.D. Mo. Apr. 2, 2021) (describing treatment consisting primarily of narcotic pain medication as conservative).

Plaintiff additionally takes issue with Dr. Trowbridge's opinion, arguing it was supported by only one month of medical records. The Court finds no error in relying on Dr. Trowbridge's opinion because the ALJ found it significant that Plaintiff's "frequency of treatment-seeking for acute migraine headaches before her alleged disability onset date and while she was still working, [was] not significantly different than the frequency of treatment-seeking after her amended alleged disability onset date." Tr. 758. The ALJ further noted that prior to her onset date she reported approximately 20-30 headaches per month, *see* Tr. 353, 361, 783, but managed to maintain full-time employment in her family's tax business, Tr. 358. After the onset date, Plaintiff reported similar frequency of headaches and continued some full-time employment. Tr. 643, 645.

The mere fact that Dr. Trowbridge's RFC assessment was written towards the beginning of the relevant period does not necessarily render it unworthy of probative value. *See, e.g., Bollinger o.b.o Bollinger v. Saul*, 2020 WL 4732042, at *3 (E.D. Mo. Aug. 14, 2020) (finding a 2-year-old opinion valid evidence since there was "no objective medical evidence in the record"

18

showing "a marked change in condition" after the opinion). An ALJ can rely on the "opinion of a state agency medical consultant who did not have access to all the records, so long as the ALJ conducts an independent review of the evidence and takes into account portions of the record the consultant had not considered." *Kuikka v. Berryhill*, 2018 WL 1342482, at *10 (D. Minn. Mar. 15, 2018). As discussed in detail above, the ALJ considered the entirety of the medical evidence, including the records submitted after the state agent provided her opinion. "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because we would have decided the case differently." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). The ALJ's RFC determination is supported by an extensive review of the record, including an analysis of the objective medical evidence, medical opinion evidence, and Plaintiff's own testimony. Therefore, the Court finds the ALJ's RFC assessment is supported by substantial evidence on the record as a whole. Consequently, the Court does not find error in the ALJ's consideration of Dr. Trowbridge's opinion.

### B. Evaluation of Plaintiff's Headaches and Pain

First, Plaintiff argues the ALJ should not have taken issue with her failure to seek emergency care services during the time in which she did not have insurance. ECF No. 22 at 7-8. Plaintiff points to her October 28, 2018 hearing in which she testified that going to the ER did not help because hospital treatment could not alleviate her pain, and "the hospitals told [her] to stop coming because they couldn't help [her]." Tr. 28. However, the Court finds the ALJ appropriately considered her lack of ER visits because she expressly indicated in her Function Report that she spent "85%" of her time "in bed, in a doctor's office, or *ER*" due to nausea, vomiting, and fever. Tr. 754 (citing Tr. 239) (emphasis added). Thus, it was appropriate for the

19

ALJ to consider that her statement was not accurate as she had not been to the ER during the relevant period. Moreover, Plaintiff argues the gaps in her treatment were because she "was not able to afford medical treatment for specific periods of time." *See* ECF No. 22 at 4. Consequently, the ALJ reasonably observed she did not appear to seek or inquire about any affordable treatment options, including assistance from an emergency department, "which under Federal law [she] could not have been denied despite lack of coverage." Tr. 757.

Second, Plaintiff contends the ALJ erroneously categorized her treatment as conservative. ECF No. 22 at 8. As previously discussed in this Order, the Court finds no issue with the ALJ's decision to treat oral medications and occasional injections as a conservative treatment plan. Further, all of the treatment notes cited by Plaintiff in support of this argument were dated prior to her amended alleged onset date of March 17, 2017.

Third, Plaintiff takes issue with the RFC, which "only provides accommodations to help prevent the exacerbation of [her] headaches and fails to provide accommodations for when [she] has a headache and cannot function at all or requires a quiet, dark place to lay down." ECF No. 22 at 8-9. The ALJ exhaustively discussed the objective medical record and adopted Dr. Trowbridge's RFC. While Plaintiff may disagree with the RFC, "[i]t is the function of the [ALJ] to weigh conflicting evidence and to resolve disagreements among physicians.'" *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014) (quoting *Kirby*, 500 F.3d at 709). The Court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Id.* The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." *KKC ex rel. Stoner*, 818 F.3d at

370. As the ALJ noted in his determination, none of Plaintiff's treating providers observed her to be irritated by the fluorescent lighting or sounds that are common in a doctor's office. Tr. 757. Plaintiff reported watching movies with her children as a recreational activity. Tr. 243, 759. She was also divorced in 2019 and had a fiancé by June of 2020. Tr. 759. The ALJ reasoned that moving to another state, dating, and getting engaged did not align with her account of spending most of her time in bed and avoiding noise. *Id.*

Fourth, Plaintiff appears to take issue with the ALJ's consideration of the various activities the record indicates she engaged in during the relevant period, such as driving, traveling as a passenger in a car for 3.5 hours, performing light chores, moving to Arkansas, and getting engaged. ECF No. 22 at 9-10. The Court finds no error primarily because an ALJ is permitted to consider activities of daily living when assessing the credibility of a claimant's limitations. See 20 C.F.R. § 404.1529(c)(3)(i) (stating that the ALJ will consider a claimant's daily activities in assessing the severity of her alleged impairments). Moreover, the ALJ expressly acknowledged in his determination that "activities of daily living generally are never performed eight hours per day, five days per week, and so, evidence of admitted activities of daily living never establishes that a person could do those activities 8/5/40." Tr. 759. Such a statement indicates the ALJ did not base his determination solely on her reported ability to engage in certain activities.

Fifth, while Plaintiff states she is "uncertain" whether the ALJ was correct in stating she received treatment at the same frequency or more prior to her alleged onset date, she takes issue with the fact the ALJ did not address her lack of insurance or that she only worked as a seasonal part-time employee. ECF No. 22 at 10. Contrary to Plaintiff's contention, however, the ALJ *did* take note that she lost her insurance. *See* Tr. 754 ("She indicated that she had Medicaid until she

and her husband divorced sometime in 2019."). Further, the ALJ did not make a mistake in believing she was working full-time during the relevant period because two treatment notes from her PCP, dated August 3, 2017 and March 21, 2018, explicitly state "she works full-time." Tr. 625, 643. The ALJ may properly consider discrepancies between subjective complaints and actual behavior as detracting from credibility. *Jackson v. Astrue*, 2008 WL 4368151, at \*7 (E.D. Mo. Sept. 18, 2008) (citing *Goodale v. Halter,* 257 F.3d 771, 774 (8th Cir. 2001)).

Sixth, Plaintiff argues the ALJ should not have found that her Function Report, dated March 31, 2017, was in conflict with her treatment notes. ECF No. 22 at 11. Within her Function Report, Plaintiff wrote that her medications caused dizziness, chest tightening, drowsiness, dry mouth, fatigue, weight gain, nose bleeds, and weakness. Tr. 245. In comparison, on May 8, 2017, Plaintiff appeared to Vertex Spine and Pain to program her permanent stimulator implant. Tr. 401-03, 755. During this appointment, her treating physician wrote: "Medication Use: The patient has no complaints of side effects." Tr. 402. The ALJ found it significant that the May 2017 record indicated she had no medication side effects; however, she claimed in her Function Report, approximately one month prior, she had an array of side effects from her medication. Tr. 758. *Compare* Tr. 401-03 *to* Tr. 239-53. While Plaintiff points to other records in which Plaintiff complained of the symptoms listed in her Function Report, the Court finds no error in the ALJ's comparison of two contradicting records.

### C. ALJ's Determination to Decline a Consultative Examination

On October 5, 2021, the Honorable Nannette Baker remanded this action to the Commissioner stating, in part:

> In light of the "little weight" assigned to the opinions of Dr. Moniz and Dr. Trowbridge, there is not sufficient evidence in the record to substantiate the limitations contained in the RFC determination. The record does not contain additional medical opinions regarding O'Neal's ability to function in the

workplace. The Court will reverse and remand this action so that the ALJ can obtain a consultative examination and make a new RFC and credibility determination.

*O'Neal*, 2021 WL 4552167, at *7.

In addressing Judge Baker's remand instructions, the ALJ wrote the following:

The undersigned has fully considered the suggestion of the District Court that the claimant be referred to a consultative examination, but respectfully declines to do so. Per 20 CFR 404.1517, we "may" ask a claimant to attend one or more examinations at agency expense when a claimant's medical sources cannot or will not give us sufficient medical evidence about their impairments to determine whether that claimant is disabled. In this case, the District Court order is dated October 5, 2021, but the date last insured is September 30, 2019 – about two years earlier. A consultative examination would provide little probative value in determining whether the claimant was disabled from her amended alleged onset date in March of 2017 through the date last insured. As is noted in the District Court order, and also discussed in detail below in this decision, a significant question in this case is whether the claimant would miss work often enough during the relevant period to be unemployable or disabled. The undersigned notes that a consultative examining physician evaluating the claimant today in 2023 would not be able to provide any probative evidence about the issue of whether and how often the claimant might have missed work more than six years ago, between March 17, 2017, and before September 30, 2019, when her disability insured status expired. The undersigned accordingly declines to refer the claimant to a consultative examination at agency expense.

Tr. 748.

Plaintiff argues the ALJ erred by failing to comply with this Court's remand order and declining to obtain a consultative examination. ECF No. 22 at 12. The Court does not find error. "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley*, 829 F.3d at 932. However, there is no requirement that an RFC finding be supported by a specific medical opinion. *Hensley*, 829 F.3d at 932 (RFC affirmed without medical opinion evidence); *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (same); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012) (same). "In the absence of medical opinion evidence, medical

records prepared by the most relevant treating physicians can provide affirmative medical evidence supporting the ALJ's residual functional capacity findings." *Hensley*, 829 F.3d at 932 (citing *Johnson v. Astrue*, 628 F.3d 991, 995 (8th Cir. 2001)). If the medical record is adequately developed, the ALJ is not required to seek additional information or order a consultative examination. *Id.* (citing *KKC ex rel. Stoner,* 818 F.3d at 372-73).

The ALJ again reviewed the record upon remand, gave Dr. Trowbridge's opinion substantial weight, formulated a new RFC, and performed a new credibility analysis. With the medical record adequately developed on remand, the ALJ was not required to order a consultative examination, and the failure to do so is not cause for reversal. *Id.*; *see also* 20 C.F.R. § 404.1519a(b); *Martise*, 641 F.3d at 926-27 (The ALJ is required to order further medical examinations only if the existing medical record does not provide sufficient evidence to determine whether the claimant is disabled).

Additionally, the ALJ clearly and appropriately explained why he did not obtain a consultative examination. *See* 20 C.F.R. § 404.1519b(c) ("we will not purchase a consultative examination . . . when your insured status has expired and there is no possibility of establishing an onset date prior to the date your insured status expired"); *See, e.g., Welch v. Colvin*, 566 Fed. Appx. 691, 695 (10th Cir. 2014) (holding no error in the ALJ's failure to order a consultative examination where current medical record was "sufficient to make a disability determination" and claimant's "date last insured" had already expired so a consultative examination would not have "materially assisted" in the decision); *Gonzalez-Rodriguez v. Barnhart*, 111 Fed. Appx. 23, 25 (1st Cir. 2004) (consultative examination obtained after plaintiff's insured status had expired were "of limited value in determining the extent of claimant's mental impairment *prior to* the expiration of this status."); *Trudell*, 2021 WL 1238215 at *4 (obtaining a consultative

24

examination after plaintiff's insured status expired "would have been irrelevant to the ALJ's determination of disability during the relevant period"). Thus, the Court finds Plaintiff did not demonstrate prejudice resulting from the ALJ's failure to order post-insured status consultative examinations.

For the foregoing reasons, the Court concludes that the ALJ's determination is supported by substantial evidence on the record as a whole and contains no legal errors.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff Jennifer O'Neal's Complaint is **DISMISSED, with prejudice**. A separate judgment will accompany this Memorandum and Order.

**IT IS FURTHER ORDERED** that the Clerk of Court shall substitute Martin J. O'Malley for Kilolo Kijakazi in the court record of this case.

So Ordered this 11th day of July, 2024.

STEPHEN R. WELBY
UNITED STATES MAGISTRATE JUDGE